# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7523 | **DATE** | 4/22/2002 |
| **CASE TITLE** | Dimmitt & Owens Financial, Inc. vs. Superior Sports Products, Inc., et | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 5/29/2002 at 10:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Plaintiff's motion for partial summary judgment on the issue of individual defendant Donald Park's personal liability [32-1] is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | APR 2 3 2002 | |
| ✓ | Docketing to mail notices. | | date docketed | 38 |
| | Mail AO 450 form. | | CDY | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | |
| RO | courtroom deputy's initials | U.S. DISTRICT COURT | date mailed notice | |
| | | 00 APR 22 PM 6:00 | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DIMMITT & OWENS FINANCIAL, INC.,   )
a Michigan corporation,   )
   )
      Plaintiff,   )
   )
     v.   )
   )
SUPERIOR SPORTS PRODUCTS, INC.,   )
an Illinois corporation, SUPERIOR SPORTS   )
INTERNATIONAL, INC., an Ontario   )
corporation, SUPERIOR SOURCE, INC., an   )
Ontario corporation, and DONALD PARK,   )
an individual,   )
   )
      Defendants.   )

**DOCKETED**

**APR 2 3 2002**

No. 00 C 7523

Judge Ruben Castillo

## MEMORANDUM OPINION AND ORDER

Plaintiff Dimmitt & Owens Financial, Inc. ("Dimmitt") moves this Court for a partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, on Plaintiff's claim that individual Defendant Donald Park should be held personally liable for any money judgment made against Defendants Superior Sports Products, Inc. ("SSP"), Superior Sports International, Inc. ("SSII") and Superior Source, Inc. ("SSI"). For the reasons contained herein, Plaintiff's motion for partial summary judgment is granted. (R. 32-1.)

## RELEVANT FACTS

The following facts are derived from Plaintiff's statement of material facts and accompanying exhibits. As we note in further detail herein, this Court is dismayed by Defendants' failure to comply with Local Rule 56.1(b)(3) which, in regard to summary judgment pleadings, governs the nonmovant's response to the movant's statement of material facts in the Northern District of Illinois. The Court is also dismayed that Defendants have provided only

minimal corporate records, financial statements or accountant filings in support of their arguments.[1] For instance, no corporate or financial records have been provided whatsoever in regard to the operation of SSII or SSI. Because Defendants have failed to properly respond to Plaintiff's 56.1(a) statement, Plaintiff's factual allegations are deemed admitted to the extent they are relied upon by the Court, and form the basis for the following factual summary.

Donald Park ("Park"), a Canadian citizen, moved to Chicago in 1996 with the intent to set up a wholesale sporting goods business, specializing in the sale of sport fishing products. He was attempting to gain entry into the sport fishing product industry which, in 1996, was a $12.6 billion-a-year industry. Park testified that his business strategy was to offer customers better quality products – fishing rods in particular – at certain price points using their own brand name. In September 1996, SSP's Articles of Incorporation were filed with the Illinois Secretary of State. The filing indicates that the amount of paid-in-capital for SSP was $100.[2] Park testified that this came in the form of cash from his mother Chong Hyok Park ("Chong"), and was intended to start the business and to open a corporate account for SSP.[3]

---

[1] Defendants did not conduct discovery and did not take any depositions. Park testified that he provided all of the documents he could in response to Plaintiff's requests during this litigation, and that he cannot find any additional financial statements. Moreover, Park testified that the accounting firms hired to prepare tax returns for SSP were not called upon to make financial statements.

[2] Defendants admit that SSP's 1997 Annual Report states that the paid-in-capital was $100.00.

[3] Reflecting the uncertainty of the financial record as a whole, Chong testified that she never invested any money at all into SSP. Beyond the paid-in capital at the time of incorporation, there are conflicting statements as to the initial capitalization of SSP, it being either $17,565 or, alternatively, $20,000 to $30,000. This money came either from Park's parents or from Park himself.

Park and Chong testified that Chong was SSP's sole shareholder. Chong, however, never purchased any shares of stock in SSP, was never issued stock certificates and never received dividends.[4] Chong testified that she was president of SSP at the time of its incorporation.[5] The Board of Directors meetings, on September 25 and October 14, 1996, also indicate that Chong had been nominated as president.[6] Chong, however, testified that she did not actually participate in any way in the operations of SSP. In fact, Chong testified that she had never attended a corporate meeting. Park, himself, testified that his parents solicited sales in Canada, that orders would be sent to SSP to be processed and that his parents would receive a copy of the invoice. Chong was not paid a salary from SSP. She did, however, receive checks from SSP, which she used for both personal expenses and expenses related to the "Canadian end of the business." (R. 32-3, Pl.'s Facts at 15.) Both Chong and Yong subsequently resigned from SSP because of family fighting and disputes over how the family business was being run.

The record is ambiguous as to Park's official role or "status" in SSP.[7] Chong testified that it was Park's decision to incorporate in Illinois. Similarly, Park testified that he was involved in the incorporation of SSP. The minutes for the organizational Board of Directors

---

[4] Park testified that such formalities were not necessary because SSP was a family business.

[5] Although the record is unclear on this point, Park's father, Yong Soo Park ("Yong"), also served on SSP's Board of Directors.

[6] SSP's corporate meetings, held on September 25 and October 14, 1996, indicate that Chong was present at the meetings. Chong, however, testified that she could not remember attending any corporate meetings on those dates.

[7] In response to questions regarding his official title, Park testified that titles did not matter in a family business such as SSP.

3

meeting list Park as SSP's secretary. The next corporate meeting lists him as SSP's general

manager as well as its secretary.[8] However, SSP's 1997 Annual Corporate Report was executed

by Park as its president. Moreover, the Report indicates that he was SSP's sole officer. Park

testified that he maintained the books for the corporation and signed SSP's 1997 and 1998 U.S.

tax returns.[9] He drafted and signed the minutes of the annual shareholders meeting for SSP on

October 12, 1998 and October 19, 1999, in which he is listed as a shareholder. Park, however,

has denied that he was a shareholder in the business and that he never issued stock to himself.[10]

Park considered himself the managing officer of the business, handling most of the day-to-day

activities. There were no other employees of the corporation, other than Park and some

commission representatives. Park became SSP's registered agent at some point in time. In

regard to the Canadian corporations, SSII and SSI, Park testified that he received the check

registers prepared by his parents for these corporations, put them on an Excel spreadsheet and

sent them to their accountant in Winnipeg.

    SSP operated out of Park's home in Schaumburg, Illinois. Although he was not paid a

salary, he would draw money from SSP when he needed to pay personal expenses. Other

instances of Park's use of SSP in regard to personal expenses include the following: (1) SSP paid

---

[8] Chong testified that Park was the secretary and general manager at the time of SSP's incorporation.

[9] Park testified that he executed the 1998 tax return "possibly as Vice-President," (R. 32-3, Pl.'s Facts at 6), although Park indicated that the records for SSP do not state that the office of vice president exists.

[10] Park personally guaranteed a $50,000 business loan from Oxford Bank & Trust even though he testified to not being a shareholder. This loan was originally a term loan for one year, but because of cash flow difficulties it was not paid off for a year-and-a-half to two years.

for his personal computer; (2) a portion of his apartment rent was written off as having been used for the business of SSP; (3) expenses related to his car lease and insurance were passed through SSP as an expense; (4) he had multiple credit cards which he used for both personal expenses and expenses related to SSP; (5) checks were written on SSP's corporate account to make payments on preexisting Canadian credit cards; and (6) his cell phone was charged to SSP as an expense. In short, Park testified that he earned his income by passing expenses through SSP. Moreover, he would occasionally draw cash from SSP in order to defray other expenses that he had incurred.[11] On one occasion, Park also sent SSP money to his brother, Frank Park, for personal expenses.

On October 27, 1997, Park made a written application to Dimmitt for financial assistance, on behalf of SSP as its president. In addition, the application states that Park owned 100% of the stock in SSP. Dimmitt is in the business of providing financial assistance to companies by, among other things, purchasing accounts receivable from companies that sell products and services to other companies, as well as by assisting with letters of credit so that businesses can purchase goods from overseas suppliers. In January 1998, Dimmitt and each of Defendant corporations (SSP, SSII, SSI) entered into two types of contracts for financing. The first type of contract consisted of three agreements for the issuance of irrevocable commercial letters of credit. The second type of contract was an Accounts Receivable Purchase Agreement with security agreement ("Factoring Agreement"). Park executed these written contracts with Dimmitt on behalf of SSP as its president, on behalf of SSII as its vice president, and on behalf

---

[11] For instance, Park used SSP funds to retain a law firm in order to counsel him on applying for U.S. citizenship.

of SSI as its manager.[12] Park testified that he entered the agreements so that, when predicted orders were received, the business would have enough capital to bring in products and serve their customers properly.[13] Similarly, he testified that they needed extra help from Dimmitt in order to create cash flow and to get money back quicker so that they could reinvest in further inventory. Chong testified that she did not participate in any transactions involving the sale of accounts receivables to Dimmitt. Chong testified that this, as well as anything involving money, was left to Park.

Dimmitt subsequently arranged for the issuance of letters of credit by Michigan National Bank on behalf of Defendants for the benefit of Defendants' suppliers. According to the language of the contract, Defendants agreed to reimburse Dimmitt for all draws made by Defendants' suppliers against the letters of credit within thirty days of any draw. Pursuant to the letters of credit agreement, six draws were made on the agreement totaling $256,326.15, including the draw fee, origination fee, interest and bank fees. Pursuant to the Factoring Agreement, Dimmitt purchased nineteen invoices from Defendants with a total face value of $16,801.94. Dimmitt stamped these invoices with a "notice of assignment," payable only to Dimmitt, and forwarded these invoices to the account debtors.

SSP was involuntarily dissolved by the Illinois Secretary of State on February 1, 1999.

---

[12] Park testified that he was not a shareholder, officer or employee of SSI, but that he did execute agreements on behalf of SSI to obtain financing from Dimmitt. He was not authorized by Chong, however, to execute agreements on behalf of SSI.

[13] Park testified that the tax return for SSP for the 1997 tax year lists a loss of $7,440, while the 1998 Return lists a loss of $3,496. Park testified that the 1998 Return shows that his mother, who is listed as a foreign shareholder, contributed $15,000 to SSP. Park, however, testified that this money was not used to purchase stock in the corporation.

6

Although Park acknowledges receiving the notice of dissolution, he admits that he "did nothing" and continued to operate SSP until June or July 1999. (R. 32-3, Pl.'s Facts at 8.) Defendants admitted that they sent a letter to another business, Captain Ted's Tackle, dated November 29, 2000, to collect on two invoices that had been previously sold by SSP to Dimmitt under the Factoring Agreement. SSP was reinstated on June 5, 2001. The paid-in capital was again listed as $100.00. Chong testified that she became aware that SSP was dissolved at some point but that she has worked with SSP since June 2001.

In regard to the Canadian corporations, SSII and SSI, there is a striking paucity of information. Virtually no documents have been provided regarding these corporations, other than the contracts Park executed with Dimmitt on behalf of SSII and SSI, as its vice president and manager, respectively. The following facts are derived through Park and Chong's deposed testimony. SSII is an Ontario corporation, formed on February 14, 1997, with its principal place of business in the City of Thornhill, Ontario. SSII is also involved in the fishing product industry. Chong testified that it was Park's idea to form SSII, and that he was in charge of the operations of SSII. Chong testified that she is the president and sole shareholder of SSII, but that she did not pay anything for her shares. She did not sign or obtain any bank loans on behalf of SSII. SSII had no employees and operated out of Chong's home in Ontario. SSII did not own any property or equipment in Canada. Park and Chong testified that the 1997 and 1998 tax returns for SSII showed that there was a loss of $57,261 in 1998 and $61,103 in 1997. Chong said that she received wire transfers from Park to pay both personal and SSII expenses. Park testified that he provided funds to his parents in order to run the business in Canada. Chong believes that SSII and SSP are working together at the present time, and she testified that she has

filled orders from inventory as late as September or October 2001. She testified that, in May 2000, SSII started using the brand name of Aurora Sports Canada pursuant to a registration filed with the Canadian government. Defendants admitted that inventory purchased by SSP, using letters of credit obtained through Dimmitt, were delivered directly to Canada.

SSI was incorporated on October 1, 1997. Chong testified it was created with some friends, Mr. Kim and Mrs. Yoon. Chong testified she had not seen the agreement between SSI and Dimmitt for issuance of letters of credit. After conducting one sale of plastic bags as a wholesaler, SSI was broken up. SSI never filed any income tax returns. Chong testified to signing SSI's Articles of Dissolution.[14]

On November 29, 2000, Dimmitt filed a complaint against Defendants SSP, SSII, SSI and Donald Park seeking a judgment in its favor against Defendants in the amount of $273,128.09 plus costs, prejudgment interest, attorney fees and other such relief as this Court deems proper. Count IV of the complaint specifically alleges that individual Defendant Donald Park was the alter ego of these corporations. The Court entered a judgment against Defendant SSP, regarding liability, on May 24, 2001. On August 1, 2001, the Court granted Plaintiff's motion for entry of turnover order and ordered the existing inventory of fishing equipment in Illinois and Wisconsin to be turned over to Plaintiff. On November 30, 2001, Plaintiff moved for partial summary judgment on Plaintiff's claim of piercing the corporate veil as pled in Count IV of the complaint. We hereby grant Dimmitt's motion for the reasons that follow.

---

[14] Defendants have failed to produce any documents regarding the current financial status of SSP, SSII or SSI.

# LEGAL STANDARDS

## I. Summary Judgment Pleadings

This Court recently noted a trend of poorly presented and argued summary judgment motions. *Malec v. Sanford*, 191 F.R.D. 581, 582 (N.D. Ill. 2000). Accordingly, we strongly encourage Defendants to review *Malec*, which thoroughly clarifies the requirements governing summary judgment pleadings in the Northern District of Illinois. The local rules serve an important function in structuring the summary judgment process. *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). The Seventh Circuit explains that the local rules "'assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence.' Given their importance, we have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Id.* (quoting *Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999)).

In the instant case, Plaintiffs filed a 56.1(a) statement. Pursuant to Local Rule 56.1(b), Defendants, the nonmovants, were required to file a response to Plaintiff's 56.1(a) statement. Local Rule 56.1(b)(3)(A) requires that the nonmovant's response contain a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record and other supporting materials relied upon. Local R. 56.1(b)(3)(B). The penalty for a nonmovant's failure to file a proper response to a movant's 56.1(a) statement is admission of the movant's factual allegations, and often the granting of summary judgment in favor of the movant. *Id.* These dire consequences were clearly articulated in *Malec*. *See* 191 F.R.D. at 584 (explaining that a nonmovant's failure to adhere to

9

the requirements of Local Rule 56.1 is equivalent to admitting the movant's case). *See also Bordelon*, 235 F.3d at 529 (finding that the consequence of non-compliance, *i.e.*, admission of the material facts, applies regardless of contrary evidence is in the record). Here, Defendants have filed a "Statement of Material Facts" as part of their memorandum of law. This statement does not respond to any specific responses to Plaintiff's statement. Rather, it consists of an argumentative narrative that may only be construed as a general denial. As this Court has already noted, a Rule 56.1(b)(3)(A) response is not the place for purely argumentative denials. *See Malec*, 191 F.R.D. at 584.

In addition, Local Rule 56.1(b)(3)(B) corresponds to Rule 56.1(a)(3). It sets out requirements for the nonmovant's statement of additional facts that are identical to the obligations imposed on the movant's statement of facts. Specifically, the statement of additional facts must set forth, in short numbered paragraphs, facts that require the denial of summary judgment (in other words, *material* facts) supported by specific references to the record. We emphasize that Rule 56.1(b)(3)(B) "provides the only acceptable means of . . . presenting additional facts." *Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995). Simply providing additional facts in one's response memorandum is insufficient to put those facts before the Court. *Id; Malec*, 191 F.R.D. at 584. Here, Defendants failed to abide by these requirements. They incorporate facts about the business and advertising of Dimmitt which are unsupported by any citations to the record. Defendants attach two documents, regarding Dimmitt's business and advertising, as exhibits to their memorandum of law. These documents, however, have not been presented in such a way that this Court may consider them. As a result, the factual allegations contained in Plaintiff's 56.1(a) statement are deemed admitted, while Defendants' "additional

facts" are not.[15]

## II. Summary Judgment Standards

A motion for summary judgment is granted when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *See also Jordan v. Summers*, 205 F.3d 337, 342 (7th Cir. 2000). When ruling on a motion for summary judgment, the Court must view all evidence in the light most favorable to the non-moving party and draw all inferences in the non-movant's favor. *Crim v. Bd. of Educ. of Cairo Sch. Dist. No.1*, 147 F.3d 535, 540 (7th Cir. 1998). If the evidence is merely colorable or is not sufficiently probative, however, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249-50. Moreover, in considering a motion for summary judgment, the Court need not assume the truth of a nonmovant's conclusory allegations on faith or scour the record to unearth material factual disputes. *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir. 1998). Ultimately, the Court must decide "whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1573 (7th Cir. 1989). With these standards in mind, we now turn to our analysis of Plaintiff's motion.

---

[15] Rule 56.1(a)(3)(B) provides that if additional material facts are submitted by the opposing party pursuant to section (b), the moving party may submit a concise reply in the form prescribed in that section for a response. All material facts set forth in the statement filed pursuant to section (b)(3)(B) will be deemed admitted unless controverted by the statement of the moving party. Here, Plaintiff avoids this penalty for not filing a Reply Statement of Material Facts, as required by Local Rule 56.1(a)(3), in light of Defendant's failure to follow Local Rule 56.1(b)(3)(B) in regard to submitting additional material facts.

## ANALYSIS

### I. Piercing the Corporate Veil

A corporation is an autonomous entity "separate and distinct from its shareholders, directors and officers, and, generally, from other corporations with which it may be affiliated." *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569 (7th Cir. 1985). This autonomy shields parties related to a corporation from the liabilities of that corporation. *Spartech Corp. v. Opper*, 890 F.2d 949, 953 (7th Cir. 1989). Equity, however, has created a device called "piercing the corporate veil," which prevents purveyors of fraud and injustice from hiding behind the corporate form of organization. *See Alpert v. Bertsch*, 601 N.E.2d 1031, 1036 (Ill. App. Ct. 1992).

It must be observed, however, that the Court's power to pierce the corporate veil "should be exercised reluctantly and cautiously." *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 541 (7th Cir. 1980). *See also Brown Leasing, Inc. v. Stone*, 673 N.E.2d 430, 438-39 (Ill. App. Ct. 1996). Accordingly, a party seeking this remedy has the substantial burden of showing that the corporation is merely a sham which exists for the benefit of another dominating entity, its alter ego. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996).

Illinois courts apply a two-prong test to determine whether to pierce the corporate veil: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual or other corporation no longer exist; and (2) circumstances must be that such an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994) (quoting *Van Dorn Co.*, 753 F.2d at 569-70). *See also Sea-Land Servs., Inc. v. Pepper Source*,

941 F.2d 519, 520 (7th Cir. 1991).

**A. First Prong**

With respect to the first prong, in order to find sufficient unity of interest and ownership to warrant piercing the corporate veil, Illinois courts consider numerous factors including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a shareholder; (10) failure to maintain arm's length relationships among related entities; and (11) whether the corporation is a mere facade for the operation of the dominant shareholders. *Jacobson*, 664 N.E.2d at 331. Significantly, no single factor is determinative in deciding whether to disregard a corporate entity. *In re Estate of Wallen*, 633 N.E.2d 1350, 1357 (Ill. App. Ct. 1994).

There is ample evidence to demonstrate that most, if not all, of these factors are present in this case. Defendants, if anything, have produced few records showing otherwise. An unfavorable evidentiary presumption arises if a party, without reasonable excuse, fails to produce evidence which is under his control. *Berlinger's, Inc. v. Beef's Finest, Inc.*, 372 N.E.2d 1043, 1048 (Ill. App. Ct. 1978). *See also McCracken v. Olson Cos., Inc.*, 500 N.E.2d 487, 492 (Ill. App. Ct. 1986) (when there is a failure to produce a legitimate explanation as to the unavailability of business records, it can reasonably be inferred that those documents would have revealed the corporations' poor financial standing). Here, Defendants stated that "[a]ll responsive documents in the possession or control of Defendant Donald Park were furnished to Plaintiff on June 25 and/or June 26, 2001." (R. 33-2, Pl.'s App. B, Answer to Pl.'s Req. for

13

Produc. of Docs.) Park also testified that he provided all of the documents he could in response to Plaintiff's requests during this litigation. (R. 32-3, Pl.'s Facts at 7.) This Court observes, however, that Defendants have not conducted any discovery on their own and have not taken any depositions in regard to the missing records. With respect to the first prong, Defendants have not provided a reasonable explanation for the absence of the corporate or financial documents that would support their arguments against piercing the corporate veil. It is difficult for this Court to understand how most of the corporate and financial documents for SSP, SSII and SSI, if they did exist, were simply lost by Defendants or their accountants. Accordingly, this Court infers that those documents would have revealed the corporations' poor financial standing. We will address the pertinent factors in turn, in light of the adverse inference that applies to Defendants herein.

First, "[t]o determine whether a corporation is adequately capitalized, one must compare the amount of capital to the amount of business to be conducted and obligations to be fulfilled. . . . Absent adequate capitalization, a corporation becomes a mere liability shield, rather than an independent entity capable of carrying on its own business." *Fiumetto v. Garret Enters., Inc.*, 749 N.E.2d 992, 1005 (Ill. App. Ct. 2001) (citations omitted). The only documentary evidence brought to the attention of the Court, in regard to SSP's initial capitalization, is the $100 paid-in-capital at time of incorporation. Other evidence of the initial capitalization is unsupported by any financial records and is numerically uncertain. Park testified that he started SSP with $20,000 to $30,000. Alternatively, Defendants admitted that the initial capitalization of SSP was $17,565. In addition, Park personally guaranteed a $50,000 loan from Oxford Bank & Trust. This loan appears not to have been paid off in a timely manner.

There is evidence that, prior to and at the time they executed contracts with Dimmitt for

14

financial assistance, Defendant corporations were undercapitalized. As an initial matter, Chong testified that the corporations did not make any money. The SSP tax returns for 1997 and 1998 showed losses of $7,440 and $3,496, respectively. Park and Chong testified that the SSII tax returns for 1997 and 1998 showed losses of $61,103 and $57,261, respectively. Other than the bank loan that Park personally guaranteed, the only money that appeared to go into these corporations either came from Park or his parents. Only one of these cash infusions has been documented: SSP's 1998 tax return indicates that Chong contributed $15,000 to SSP. Park, however, testified that this money was not used to purchase stock in the corporation.

Additionally, Chong testified that she never invested any money at all into SSP. On the basis of these facts, this Court can only conclude that Defendant corporations were financed only by occasional monies loaned to them by Park or his parents, prior to receiving the approximately $250,000 advanced to Defendants on the letters of credit. Simply put, Defendants have not provided any documents demonstrating that they had an adequate repository of capital to even carry on their business, let alone enough capital to fulfill their substantial financial obligations to Plaintiff. In view of the large business venture these corporations were engaged in – importing fishing goods from Asia in order to break into a large and established sporting goods industry – these facts support Plaintiff's contention that the corporations were undercapitalized.

Second, it appears that Defendant corporations failed to issue stock. Although Chong and Park have testified that Chong was the sole shareholder in SSP and SSII, Chong testified that she never purchased stock in these corporations. Additionally, Park testified that Chong was never issued any stock certificates.

Third, none of Defendant corporations adequately maintained corporate records or

15

complied with corporate formalities. Defendants have supplied SSP's Corporate Minute Book and SSP's tax returns for 1997 and 1998. The Corporate Minute Book only records the minutes of four meetings. Certainly, a failure to keep minutes of corporate meetings may not be significant enough in itself to warrant forfeiture of limited liability. *See Browning-Ferris Indus. Inc. v. Ter Maat*, 195 F.3d 953, 960-61 (7th Cir. 1999). There is uncertainty, however, as to whether these meetings were ever held. Contrary to indications in the Corporate Minute Book, Chong testified that she never attended any corporate meetings. If that is the case, the only person at SSP's meetings would be Park himself, who authored and signed the minutes. In regard to SSII and SSI, Defendants have only produced the articles of incorporation for SSII and SSI, SSII's Canadian tax returns for 1998 and 1999 and the articles of dissolution for SSI. Defendants have provided no evidence that corporate formalities were followed in these corporations. Further, Defendants' neglect of legal requirements (*i.e.*, their failure to file proper forms with the Illinois Secretary of State) caused SSP's corporate status to lapse, resulting in its dissolution on February 1, 1999. Although there was no corporation in existence, it appears that Park continued to do business as a corporation for several months thereafter and did not file a tax return for SSP for that year. Overall, the records and testimony supplied by Defendants do not rise to the level of rebutting the evidence presented by Plaintiff which indicates that Defendants, on the whole, did not respect corporate formalities.

Fourth, no dividends were ever paid by SSP to Chong even though she testified to being the sole shareholder. Additionally, there is no evidence that SSII or SSI paid dividends to her.

Fifth, Defendants have not produced any records regarding the existing corporations' present financial status or their solvency. The Certificate of Reinstatement for SSP, dated June 6,

2001, indicates that the amount of paid-in-capital for SSP remained $100. Defendants, in their answers to Plaintiff's interrogatories, indicated that SSP's present capitalization was approximately $70,000. Defendants, however, have not produced any documents supporting the accuracy of this figure.

Sixth, there is evidence that SSP and SSII's corporate officers and directors were nonfunctioning. Although Chong testified to being the president and sole shareholder of SSP and SSII, she testified that Park was in charge of the operations for both of these corporations. The financing for the corporations was wholly left to Park. Although Chong was to solicit sales though the "Canadian end of the business," orders would be sent to SSP and processed by Park. Additionally, Park's parents eventually resigned from their corporate offices, leaving Park as the only individual running SSP. Defendants have produced little or no evidence showing that anyone other than Park directed or ran the affairs of the corporations.

Seventh, as the Court has already noted, there is a conspicuous absence of corporate records.

Eighth, there is evidence that personal and corporate funds were commingled and that there was a diversion of funds from the corporations for the personal use of Park or his family. Although he was not paid a salary, Park would draw money from SSP to pay for personal expenses. Park's car, cell phone and personal computer were paid through SSP as corporate expenses. A portion of his rent was passed through SSP as a corporate expense. Park used corporate funds to retain a law firm to advise him on applying for U.S. citizenship. There is also some testimony that Park used SSP's corporate bank account to pay off his credit cards. Although Chong did not receive a salary, Park would send checks from SSP to Chong to pay for

both SSII's corporate expenses and Chong's personal expenses. Additionally, Park sent money from SSP to his brother for his brother's personal expenses. Plaintiffs have supplied sufficient evidence to support their assertion that Defendants commingled their funds with that of the corporation and treated corporate funds as their own.

Ninth, there is evidence that Defendants failed to maintain arms' length relationships among related corporate and personal entities. The evidence demonstrating lack of respect for separate corporate identities may vary from case to case, but illustrative factors generally include common management, business purpose, operations, equipment, employees, and supervision as well as the commingling of assets and common ownership. *See Bd. of Trus. of Chi. Plastering Inst. Pension Trust Fund v. William A. Duguid Co.*, 761 F. Supp. 1345, 1348 (N.D. Ill. 1991) (explaining that alter ego relationships generally exist where businesses share management, business purpose, operations, equipment, supervision and ownership). The Seventh Circuit has concluded that the extent of interrelationship between the three corporate defendants in the areas of hiring, recruiting, supervising and maintaining payroll records "suggest[ed] a lack of respect for the separate identity of the corporations." *Cent. States, Southeast and Southwest Areas Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1288 (7th Cir. 1996). Here, there is extensive evidence of the intimate interrelationship among the three corporate Defendants, as directed by Park, to suggest a lack of respect for their separate corporate identities. As this Court has already noted, Park was the only individual who obtained financing for the corporations and was the only individual effectively running the corporate operations for SSP and SSII, both of which were involved in the same business purpose of importing fishing equipment. Additionally, there is evidence that funds were informally transferred between Defendant corporations, Park and his

18

family without following proper corporate formalities. *See Hystro*, 18 F.3d at 1389-90 (finding an alter ego relationship where one corporation closely controlled the alter ego's finances and paid the salaries of the alter ego's officers, where the two corporations informally transferred money to one another, and where other corporate formalities were absent).

Tenth, there is evidence that the corporations were a mere facade for the operations of the dominant shareholder. Although it is unclear whether the corporations did, in fact, have shares or shareholders, Plaintiffs have presented overwhelming evidence that Park was the single, dominant personality behind the operations and financing of Defendant corporations. In short, without Park, these corporations may never have existed, let alone operated as corporations. Park's parents apparently solicited business from the "Canadian end of the business," and SSP allegedly had commission representatives, but Defendants have submitted little evidence supporting their argument that the corporations were not generally a facade for Park's own financial and business activities. On the other hand, Plaintiffs have supplied sufficient evidence demonstrating that these corporations commingled funds, did not observe proper corporate formalities and were subjected to Park's own personal use.

Although this Court recognizes that none of the above factors is determinative for piercing the corporate veil, this Court also recognizes that each of these factors was present, to a large degree, in the instant case. Therefore, with respect to the first prong, Plaintiffs have produced enough evidence supporting their argument that Park exercised great personal control over the existing corporations thereby creating the sufficient unity of interest and ownership between Park and the corporations to warrant piercing the corporate veil.

**B. Second Prong**

In addition to establishing sufficient unity of interest to justify piercing the corporate veil,

Dimmitt must allege facts sufficiently demonstrating that adherence to the corporate formalities

would promote injustice or fraud. The "promote injustice or fraud" test requires that, unless the

Court pierces the corporate veil, "some 'wrong' beyond the creditor's inability to collect would

result." *Hystro*, 18 F.3d at 1390 (citing *Sea-Land*, 941 F.2d at 524). For instance, "[s]ome

element of unfairness, something akin to fraud or deception or the existence of a compelling

public interest must be present in order to disregard the corporate fiction." *Pederson v. Paragon*

*Pool Enters.*, 574 N.E.2d 165 (Ill. App. Ct. 1991) (citation omitted). Here, Park misrepresented

himself in obtaining financial assistance from Dimmitt. Park held himself out as the president

and sole shareholder of SSP when he, in fact, was not. Park also held himself out as the vice

president of SSII when he, in fact, was not. To the contrary, there is substantial evidence that the

office of vice president did not even exist. Finally, Park held himself out as the manager of SSI,

even though Chong testified that he was not authorized to obtain financing for SSI.

Defendants' memorandum of law opposing Plaintiff's motion for partial summary

judgment largely consists of distinguishing the instant case from *People v. V & M Industries,*

*Inc.*, in which the Illinois court held that the corporate veil should be pierced. *See* 700 N.E.2d

746, 753 (Ill. App. Ct. 1998). Defendants seem to argue that, in contradistinction to *V & M*, a

failure to observe corporate titles and corporate formalities should be generally excused because

SSP, SSII and SSI constituted a family business. As Plaintiff rightly points out, however, the

decision in *V & M* "does not announce any exemptions from piercing the veil for small family

businesses." (R. 37-1, Pl.'s Reply at 4). Alternatively, Defendants seem to argue that, regardless

20

of Park's misrepresentations, Dimmitt was well aware of the risks involved in the financial arrangement between the parties. The fact remains, however, that Dimmitt was prevailed upon to rely on Park's representations when the parties executed the contracts at issue. Although Defendants argue that "this is not a fraud, this is a family business," the Court concludes that such misrepresentations equal "something akin to fraud or deception." *See, e.g., Pederson*, 574 N.E.2d at 169. Additionally, we find that there is a compelling public interest that individuals should not execute contracts while misrepresenting themselves and escape personal liability when monies, advanced on the basis of such contracts, disappear without a proper accounting for their disappearance.

Moreover, as the Seventh Circuit stated in *Sea-Land*, Plaintiffs need not prove fraudulent intent in order to establish that injustice would be furthered by respecting the corporate form. *See* 941 F.2d at 522. *See also Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1193-1194 (7th Cir. 1989) (stating that to pierce the corporate veil, Illinois law requires *either* fraud *or* injustice). Rather, the "promotion of an injustice" will satisfy the second prong. *See Van Dorn*, 753 F.2d at 570. In the instant case, Plaintiffs have provided sufficient evidence that a failure to pierce the corporate veil would lead to the "promotion of injustice," and that Park would be unjustly enriched. Park, as the dominant personality behind Defendant corporations, personally gained the benefit of the monies Dimmitt advanced to Defendant corporations. As this Court already noted, Park has not properly accounted for where this money went, even though SSP and SSII still appear to be in operation. There is evidence that some of Park's personal expenses, as well as some of his family's personal expenses, were paid through monies advanced to Defendant corporations. Whether or not Park intended to divert funds from Defendant corporations, to

himself or to his family in order to frustrate Plaintiff's recovery, that is precisely the result to which the commingling of funds contributed. Based on Plaintiff's allegations concerning the commingling of corporate and personal funds by Park, the Court is persuaded that Park potentially would be enriched, to Plaintiff's detriment, if we were to allow the corporate entity of SSP, SSII and SSI to shield Park from personal liability.

## CONCLUSION

This Court concludes that Dimmitt has established that the undisputed facts substantially justify piercing the corporate veil. As such, we hold Park individually liable for any money judgment made against Defendants SSP, SSII and SSI. For the foregoing reasons, Plaintiff's motion for partial summary judgment on the issue of individual Defendant Donald Park's personal liability is granted. (R. 32-1.)

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: April 22, 2002